UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

WILLIAM ACEVEDO,

                          Plaintiff,        05 Civ. 8117 (JGK)

          - against -                       MEMORANDUM OPINION AND
                                            ORDER
JO ANNE BARNHART, COMMISSIONER OF
SOCIAL SECURITY,

                          Defendant.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiff, William Acevedo, brings this action

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking

reversal of a final determination of the Commissioner of Social

Security ("the Commissioner") that the plaintiff was not

entitled to Supplemental Security Income ("SSI").  In response,

the Commissioner moves for judgment on the pleadings pursuant

to Federal Rule of Civil Procedure 12(c) to affirm the

Commissioner's decision that the plaintiff is not entitled to

SSI under the Social Security Act ("the Act").

     The sole issue on this motion is whether substantial

evidence supports the Commissioner's finding that the plaintiff

is not entitled to SSI under the Act because he is not

disabled.

     The plaintiff filed an application for SSI benefits on

February 14, 2002, which received a protective filing date of

January 31, 2002, alleging that he had been disabled since
January 15, 2002.  (R. at 15, 62-64.)  The application was
denied on April 24, 2002.  (R. at 22-25.)  Although the
plaintiff filed an untimely request for a hearing before an
Administrative Law Judge ("ALJ"), the agency found that the
plaintiff had established good cause for his untimely filing
and granted him a hearing.  (R. at 15, 26-28, 32.)  The hearing
was held on April 22, 2004 before ALJ Michal L. Lissek.  (R. at
529-547.)  The ALJ considered the case de novo and issued a
decision on September 15, 2004 denying the plaintiff's claim.
(R. at 12-21.)  The decision became the Commissioner's final
decision on May 11, 2005 when the Appeals Council denied the
plaintiff's request for review of the ALJ's decision.  (R. at
4-6.)  This appeal followed.


                              I.

     The administrative record contains the following facts.
The plaintiff was born on September 2, 1958 and has an eighth-
grade education.  (R. at 62, 75, 536.)  He was born in Puerto
Rico and came to the United States in 1988.  (R. at 536.)  The
plaintiff reads and writes in Spanish alone.  (R. at 68, 80.)
He last worked in 1988 as an automobile mechanic.  (R. at 70,
537.)  He has lived with a "friend of the ministry" and spends
his days doing house work and reading the bible.  (R. at 90-

91.)  The plaintiff indicated that he cooked, shopped, and traveled alone to medical appointments, could do "practically anything" when it came to household chores, and could walk for up to fifteen minutes at a time.  (R. at 92-96.)

The plaintiff stated that he was not able to work because of HIV, low back pain, pain and numbness in his legs and feet, and varicose veins.  (R. at 538.)  He indicated that he received psychiatric treatment for depression.  (R. at 539.)

The record also contains the plaintiff's relevant medical history.  Prior to the eligibility period, a magnetic resonance image ("MRI") of the plaintiff's lumbar spine, performed on February 1, 2000, revealed a congenitally small spinal canal at L3-S1, and degenerative changes at L5-S1, but it showed no evidence of compression of the nerve roots.  (R. at 101.)  In January 2002, an examining physician from St. Barnabas Hospital ("St. Barnabas") diagnosed varicose veins and prescribed compression stockings.  (R. at 107-09, 441.)  The ALJ noted that the plaintiff was diagnosed with human immunodeficiency virus ("HIV") on January 29, 2000.  (R. at 17.)  Treatment notes dated February 10 and 22, 2002 from St. Barnabas noted the plaintiff's HIV infection.  (R. at 401, 411, 415.)  The plaintiff received counseling and treatment for HIV at St. Barnabas throughout 2002 and 2003.  (R. at 136-513.)  In March of 2002, Dr. Edwin Pena found that the plaintiff had no acute

or new problems; he recommended highly active antiretroviral therapy ("HAART"); it was determined that the plaintiff had a baseline CD4[1] count of 249.  (R. at 387, 391.)

Dr. Neal Mesnick, a consulting orthopedist, conducted a functional capacity assessment of the plaintiff on March 11, 2002.  (R. at 118-20.)  The plaintiff was not taking any medication or receiving treatment for his complaints of leg and back pain.  (R. at 118.)  A lumbar spine x-ray revealed mild degenerative disc disease at the L5-S1 level, and Dr. Mesnick diagnosed mechanical low back pain.  (R. at 120-21.)  He found that the plaintiff was moderately limited in lifting, carrying, pushing, and pulling heavy objects, long-distance ambulation, and standing for prolonged periods of time.  (R. at 120.)

On March 20, 2002, Dr. Forni of St. Barnabas examined the plaintiff.  (R. at 371-74.)  The plaintiff had not yet started HAART, but had had no opportunistic infections related to his HIV.  (R. at 371.)  Dr. Forni diagnosed hepatitis A and C, and referred the plaintiff to the hospital's HIV clinic to start HAART.  (R. at 373-74.)

On April 3, 2002, a doctor at St. Barnabas prescribed Vioxx for the plaintiff's back pain.  (R. at 355.)  A follow-up examination noted that the plaintiff had not yet begun HAART,

---

[1]  The weakness of an HIV patient's immune system correlates with the level or rate of decline of their T-helper lymphocyte (CD4) count.  20 C.F.R. Pt. 404, Subpart P, App. 1, § 14.00(D)(3)(a)(iii).  When the CD4 count drops below 200, susceptibility to opportunistic disease is greatly increased.  Id.

and that his CD4 count was 190.  (R. at 335, 337, 341.)
However, by August 2002, after commencing HAART, the
plaintiff's CD4 count rose to 305.  (R. at 230.)  A July 2003
examination revealed that the plaintiff's CD4 count was up to
482.  (R. at 138-39.)  A neurological examination revealed
normal reflexes.  (Id.)  In November 2003, the plaintiff was
diagnosed with sciatica and prescribed Tylenol #3.  (R. at
480.)  His CD4 count was 441.  (R. at 477-79.)

     The plaintiff was examined by Dr. Hugh Ettlinger at St.
Barnabas for the plaintiff's complaints of back pain.  Dr.
Ettlinger found that the plaintiff had a full range of motion
in his cervical spine, trunk, and upper and lower extremities.
Dr. Ettlinger reported that he was unable to elicit the
plaintiff's patellar reflex but noted that sensation was
intact.  Dr. Ettlinger's conclusions included a flattened
lumbar, and he recommended treatment with gentle osteopathic
manipulation and icing the low back for twenty minutes.  (R. at
510-511)

     On June 8, 2004, Dr. Martin Fechner, an internal medicine
physician, reviewed the evidence in the record and completed
interrogatories as a medical expert on behalf of the Social
Security Administration ("SSA").  (R. at 41, 54-61.)  Dr.
Fechner noted that the plaintiff had:  1) HIV, 2) hepatitis C,
3) diabetes, 4) chronic low back pain, 5) chronic depression,

and 6) an opioid addiction.  (R. at 54.)  Dr. Fechner's report
on the plaintiff's HIV noted no major opportunistic infections,
no signs of diarrhea or severe weight loss, and a CD4 count not
"in the danger zone."  (Id.)  No complications were reported
regarding the plaintiff's hepatitis C and diabetes.  (Id.)  Dr.
Fechner noted only "minor" changes from the plaintiff's 2002
MRI, and a physical examination showed "good ambulation and
bending at the waist."  (Id.)  He also noted that the
plaintiff's chronic depression had not led to any
hospitalizations or suicide attempts, and that the opioid
addiction had ceased.  (Id.)  Dr. Fechner reviewed the
plaintiff's ability to do work-related functions and concluded
that the plaintiff could occasionally lift and/or carry up to
twenty pounds, frequently lift and/or carry ten pounds, stand
and/or walk about six hours in an eight-hour workday, and had
no sitting or pushing and pulling limitations.  (R. at 58-61.)

     The plaintiff also had a history of depression.  (R. at
367-68).  In March 2002 he was diagnosed at St. Barnabas with
an adjustment disorder with depression and anxiety and was
prescribed Celexa and Ambien.  (Id.)  The plaintiff was seen by
St. Barnabas psychiatrists on almost a monthly basis.  In April
2002, Dr. John Burgess diagnosed a GAF score of fifty.[2]  (R. at

_____

     [2]  The GAF scale ranges from zero to one-hundred and is rated with respect
to "psychological, social and occupational functioning" on a hypothetical
continuum of health-illness.  Diagnostic & Statistical Manual of Mental

350.)  The plaintiff was seen by Dr. Carmen Natali in January
2003, who diagnosed an adjustment disorder with anxiety.  (R.
at 196.)  By March 2003, Dr. Natali reported that the
plaintiff's symptoms were in remission.  (R. at 161.)

      In May 2003, the plaintiff began seeing Dr. Lita
Lyakhovetskaya at the St. Barnabas psychiatry clinic.  (R. at
152.)  Dr. Lyakhovetskaya's initial impression was mild
depression.  (Id.)  In July 2003, Dr. Lyakhovetskaya reported
that the plaintiff's adjustment disorder with anxiety and
depression was functionally stable on medication.  (R. at 134.)
In her final mental status examination in April 2004, Dr.
Lyakhovetskaya noted only mild depression with anxiety.  (R. at
446-47.)


                            II.

      A court may set aside a determination by the Commissioner
only if it is based on legal error or is not supported by
substantial evidence in the record.  See 42 U.S.C. §§ 405(g),
1383(c); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).
Substantial evidence is "more than a mere scintilla"; it is
"such relevant evidence as a reasonable mind might accept as

---

Disorders Fourth Edition Text Revision ("DSM-IV-TR") 32 (American Psychiatric
Association 2000).  The GAF scale does not take impairment in functioning due
to physical or environmental limitations into account.  Id.  A GAF of fifty
represents serious symptoms that present serious difficulty in social,
occupational, or school functioning.  Id. at 34.

adequate to support a conclusion." Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB,

305 U.S. 197 (1938)); see also Diaz v. Shalala, 59 F.3d 307,

312 (2d Cir. 1995); Rivera v. Sullivan, 923 F.2d 964, 967 (2d

Cir. 1991).

A claimant seeking SSI benefits is considered disabled if

the claimant "is unable to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than twelve months." 42 U.S.C.

§ 1382c(a)(3)(A).[3]

The analytical framework for evaluating claims of

disability for SSI is defined by regulations of the

Commissioner, which set forth a five-step inquiry. See 20

C.F.R. § 416.920. The Court of Appeals for the Second Circuit

has described this five-step process as follows:

> 1. The Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.

---

[3] The definition of disability for the purposes of disability insurance
benefits under Title II of the Act is similar. See 42 U.S.C. § 423(d)(1)(A).
The determination of disability under Title II is also similar to the
determination of disability for purposes of SSI disability benefits under
Title XVI of the Act. Ramos v. Apfel, No. 97 Civ. 6435, 1999 WL 13043, at *4
n.1 (S.D.N.Y. Jan. 12, 1999). Cases under 42 U.S.C. § 423 are cited
interchangeably with cases under 42 U.S.C. § 1382c(a)(3). See Hankerson v.
Harris, 636 F.2d 893, 895 n.2 (2d Cir. 1980); Villanueva v. Barnhart, No. 03
Civ. 9021, 2005 WL 22846, at *4 n.5 (S.D.N.Y. Jan. 3, 2005).

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000) (internal citation omitted); see also Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999); Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Villanueva v. Barnhart, No. 03 Civ. 9021, 2005 WL 22846, at *6-7 (S.D.N.Y. Jan. 3, 2005).

The claimant bears the initial burden of proving that the claimant is disabled within the meaning of the Act.  See 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(i); see also Shaw, 221 F.3d at 132; Rodriguez v. Apfel, No. 96 Civ. 8330, 1998 WL 150981, at *7 (S.D.N.Y. Mar. 31, 1998).  This burden encompasses the first four steps described above.  See Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).  If the claimant satisfies the burden of proof through the fourth step, the claimant has

established a prima facie case and the burden shifts to the Commissioner to prove the fifth step.  See id. at 722-23; see also Infante v. Apfel, No. 97 Civ. 7689, 2001 WL 536930, at *4 (S.D.N.Y. May 21, 2001) (citing Berry, 675 F.2d at 467).  In meeting the burden of proof on the fifth step for SSI eligibility determinations, the Commissioner, under appropriate circumstances, may rely on the medical vocational guidelines contained in 20 C.F.R. Pt. 404, Subpart P, App. 2, commonly referred to as "the grids."[4]  See 20 C.F.R. § 416.969.  The grids take into account the claimant's residual functional capacity[5] in conjunction with the claimant's age, education, and work experience.  Based on these factors, the grids indicate whether the claimant can engage in any other substantial gainful work that exists in the national economy. Generally, the result listed in the grids is dispositive on the issue of disability.  However, the grids are not dispositive where they do not accurately represent a claimant's limitations because the claimant suffers from non-exertional limitations that significantly limit his capacity to work.  Pratts v.

---

[4]  The grids classify work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling.

[5]  Residual functional capacity is an assessment of an individual's ability, despite his impairment, to meet physical, mental, sensory, and other demands of jobs based on all relevant evidence.  20 C.F.R. § 416.945; Ramos, 1999 WL 13043 at *5 n.3.

Chater, 94 F.3d 34, 39 (2d Cir. 1996); Garvin v. Barnhart, 254
F. Supp. 2d 404, 409 (S.D.N.Y. 2003).

     With respect to the plaintiff's claims of mental
impairment, Social Security Regulations require the ALJ to use
a "special technique" to evaluate the claimed mental
impairment.  See 20 C.F.R. § 416.920a(a).  At step two of the
five-step procedure for evaluating disability, the ALJ must
rate the degree of functional limitation resulting from the
plaintiff's mental impairment(s) to determine whether they are
"severe."  See id. § 416.920a(a)(1); Rosado v. Barnhart, 290 F.
Supp. 2d 431, 437 (S.D.N.Y. 2003).  If the plaintiff's mental
impairment is severe, then the ALJ must determine whether the
impairment meets or is equivalent in severity to a listed
mental disorder.  See 20 C.F.R. § 416.920a(d)(2).  If the
plaintiff is found to have a severe impairment not listed in
the Appendix, then the ALJ must assess the plaintiff's residual
functional capacity to determine whether the plaintiff can meet
the mental demands of past relevant work in spite of the
limiting effects of his impairment and, if not, whether the
plaintiff can do other work, considering the plaintiff's
remaining mental capacities reflected in terms of the
plaintiff's occupational base, age, education, and work
experience.  See id. § 416.920a(d)(3); SSR 85-15 (PPS-119),

1985 WL 56857, at *4 (S.S.A. 1985); <u>Villanueva</u>, 2005 WL 22846 at *7.

In the assessment of medical evidence, a treating physician's opinion is given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 416.927(d)(2); <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993).  The Commissioner's regulations require that greater weight generally be given to the opinion of a treating rather than a non-treating physician.

### III.

In this case, the Commissioner is entitled to judgment on the pleadings.  The ALJ carefully evaluated the plaintiff's claims of physical and mental impairments, and there is substantial evidence to support his determination that the plaintiff was not disabled within the meaning of the Act.

The ALJ undertook the appropriate sequential inquiry in the plaintiff's case.  At step one, the ALJ correctly found that the plaintiff had not engaged in substantial gainful activity since January 15, 2002, the date of his alleged onset of disability.  (R. at 15.)

At step two, the ALJ determined that the plaintiff had
"endocrine, musculoskeletal, digestive disease, immune system,
mental and vascular impairments" (id.), which constituted
"severe" medical impairments under the requirements in the
regulations (R. at 16).

At step three, the ALJ correctly determined that the
plaintiff's impairments, although severe, did not meet or equal
one of the listed impairments contained in 20 C.F.R. Pt. 404,
Subpart P, App. 1.  (R. at 16.)

At step four, the ALJ noted that the plaintiff's
functional capacity was moderately limited regarding his
ability to lift, carry, push, and pull heavy objects.  (R. at
18.)  However, he found that the plaintiff's functional
capacity allowed him to do "light work activity,"[6] that
entailed "lifting no more than twenty pounds at a time and
occasional lifting and carrying of ten pounds as well as
prolonged standing and walking."  (R. at 18-19.)  Substantial
evidence supports this determination.

The ALJ reached this conclusion after considering the
physical functional capacity assessment of Dr. Mesnick, a
consultative orthopedic specialist, and Dr. Fechner, a medical
expert, as well as the plaintiff's relevant medical records.

---

[6] Regulations promulgated by the SSA correlate the findings of "light work"
to specific levels of functional capacity.  See 20 C.F.R. § 416.967(b)
(defining "light work" as "lifting no more than 20 pounds at a time with
frequent lifting or carrying of objects weighing up to 10 pounds.").

(R. at 18.)  Dr. Fechner noted that the plaintiff's HIV infection had caused no major opportunistic infections, that despite the plaintiff's hepatitis C condition his liver functions remained normal, and that the plaintiff's diabetes was well-controlled by diet.  (R. at 17-18, 54.)  As to the plaintiff's lower back pain, Dr. Mesnick's diagnosis in 2002 was "mild" degenerative disc disease.  (R. at 120.)  Dr. Fechner, in 2004, noted that x-rays showed only "minor" MRI changes and no nerve root compression.  (R. at 54.)

In determining whether the plaintiff's non-exertional impairments significantly compromised his ability to engage in light work activity, the ALJ noted that despite the plaintiff's depression and adjustment disorder with anxiety, his conditions were not marked by the need for frequent hospital emergency visits or multiple inpatient hospital admissions.  (R. at 19.) Furthermore, Dr. Fechner noted that the plaintiff's depression was not accompanied by any suicide attempts or evidence of psychotic behavior.  (R. at 19, 54.)  The ALJ correctly concluded that the plaintiff's alleged depression-anxiety disorder did not significantly compromise his ability to engage in light work activity.  (R. at 19.)  Substantial evidence in the record supports this finding.

While the opinions of the plaintiff's treating physicians are generally entitled to greater weight than those of

14

consultative physicians, such as Drs. Mesnick and Fechner, the
diagnoses of the plaintiff's treating physicians did not
support greater limitations on the plaintiff's residual
functional capacity.  The medical records also failed to
reflect greater limitations resulting from the plaintiff's back
problems than those noted by the consulting physicians.
Examinations and tests by Drs. Munsiff and Freddo at St.
Barnabas in 2003 showed no nerve compression and no muscle
weakness.  (R. at 484, 497.)  In regards to the plaintiff's
HIV, Dr. Munsiff noted the plaintiff's substantial improvement
after he started HAART as well as the absence of opportunistic
infections.  (R. at 277.)  As to the plaintiff's mental
condition, Dr. Lyakhovetskaya opined that despite the
plaintiff's adjustment disorder, he was "functionally stable"
on medication.  (R. at 134.)

    The ALJ also considered the plaintiff's subjective
complaints of functional limitations.  (R. at 18.)  The ALJ
concluded that the plaintiff's testimony as to his disability
was not credible when compared to the impairments established
by the medical history and objective clinical reports in the
record.  (Id.)  These findings are grounded in substantial
evidence in the record as a whole.  The ALJ noted, for example,
that the plaintiff asserted that he could lift and carry less
than five pounds, and could stand and walk less than five

minutes at a time, and that those assertions were not credible
when compared to the conclusions of Drs. Mesnick and Fechner
and the rationale for those conclusions.  (Id.)

An ALJ has discretion to evaluate the credibility of a
claimant and to make an independent judgment based on medical
findings regarding the true extent of the claimant's
disability.  See Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir.
1984); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983);
Centano v. Apfel, 73 F. Supp. 2d 333, 338 (S.D.N.Y. 1999) ("The
ALJ's decision to discount plaintiff's subjective complaints of
pain must be accepted by a reviewing court unless it is clearly
erroneous."); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6
(S.D.N.Y. 1995).

Because the plaintiff had no prior work experience,[7] the
ALJ proceeded to step five.  (R. at 19); see 20 C.F.R.
§ 416.920(g)(1).  The ALJ consulted the grids, and based on the
facts that the plaintiff was a "younger person"[8] with a
"limited education"[9] and no previous work experience, who could
only engage in light work, concluded that the plaintiff was

---

[7]  Plaintiff had not worked since 1988.  (R. at 19, 537.)

[8]  A "younger person" is defined as being between the ages of eighteen and
forty-nine.  See 20 C.F.R. Pt. 404, Subpart P, App. 2, § 201.00(h)(1).
During the period of eligibility, the plaintiff was between the ages of
forty-four and forty-six.  (R. at 19.)

[9]  The plaintiff only completed eight years of education in his native
Puerto Rico, and does not speak English.  (R. at 19.)

16

disabled," and therefore not entitled to SSI.  (R. at 19); see

20 C.F.R. Pt. 404, Subpart P, App. 2, § 202.16.

There is substantial evidence in the record as a whole to

support the Commissioner's determination that the plaintiff is

not disabled under the Act, and is not entitled to SSI

benefits.

CONCLUSION

The defendant's motion for judgment on the pleadings is

**GRANTED**.  The Clerk is directed to enter judgment and to close

this case.

**SO ORDERED.**

Dated:     New York, New York
           June 27, 2007

John G. Koeltl
United States District Judge